UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

PERFORMANCE LEASING CORPORATION          Case No. 9:05-bk-29836-ALP
OF COLLIER COUNTY,                        Chapter 7 Case

_____Debtor_____/
PERFORMANCE LEASING CORPORATION
OF COLLIER COUNTY,

        Plaintiff,

vs.                                       Adv. No. 9:06-ap-00372-ALP

MICHAEL WILLIAMS, d/b/a SOUTHERN
WISCONSIN PHARMACIES, and
DENNIS DAWEIDZYK, d/b/a SOUTHERN
WISCONSIN PHARMACIES,

_____Defendants_____/

## FINDINGS OF FACTS, CONCLUSIONS OF LAW
## AND MEMORANDUM OPINION

THE MATTER under consideration in this Chapter 7 case of Performance

Leasing Corporation of Collier County (the Debtor and/or Plaintiff) came before

this Court for a Final Evidentiary Hearing (the Trial) on July 25, 2007, July 26,

2007, and August 8, 2007, on a multiple-count Complaint filed by the Plaintiff

against Michael Williams (Williams) and Dennis Daweidzyk (Daweidyzk), both

of whom are doing business as Southern Wisconsin Pharmacies (collectively,

Southern Wisconsin or Defendants).

In Count I of the Complaint, the Plaintiff objects to the Defendants' Proof of Claim.  In Count II, the Plaintiff seeks a determination as to the validity, priority and extent of Southern Wisconsin's possessory lien against the personal property of the Debtor (Personal Property).  In Counts III, IV, V and VI of the Complaint, the Plaintiff seeks the entry of a judgment requiring the Defendants to turn over possession of certain items of Personal Property that were alleged to be converted by Southern Wisconsin, for common law conversion, breach of a fiduciary duty and for the Defendants failure to maintain and preserve the Personal Property after it asserted dominion and control over such property. The claim in Count VII seeks the entry of a judgment against the Defendants to avoid a possessory lien pursuant to 11 U.S.C. §§ 544, 545 and/or 547.  In Count VIII of the Complaint the Debtor seeks the entry of a judgment against the Defendants for damages resulting from a violation of the automatic stay pursuant to 11 U.S.C. §362(k)(1).

At the conclusion of the Trial, this Court announced that the record and the evidence presented to this Court by the Plaintiff failed to establish one or more of the requisite elements for each of Counts II, III, V, VII and VIII and, therefore, the Court will grant judgment in favor of the Defendants and against the Plaintiff on these counts.  This leaves for consideration the claims assert by the Plaintiff in Counts I, IV and VI.

Accordingly, the three issues before this Court are: 1) whether the Defendants had a valid Possessory Lien against the Personal Property that was not terminated by the Debtor filing its Voluntary Petition under Chapter 11 of the Bankruptcy Code; 2) whether the Debtor is entitled to a set-off of the amount owed to the Defendants for storage charges, advertising cost and interest, based on the Defendants alleged conversion, damage, loss and/or theft of any of the Debtor's Personal Property; and 3) whether the Defendants' storage fee charges were reasonable.

The Court having heard the testimony, examined the evidence presented, observed the demeanor of the witnesses, considered the arguments of counsel, and being fully advised in the premises, does hereby make the following Findings of Facts and Conclusions of Law relative to the remaining Counts as set forth above.

In order to identify the principal characters and their relationship to one another a brief description of the parties involved in this controversy should be helpful for the resolution of the remaining issues. Prior to the commencement of the above-captioned bankruptcy case filed by the Debtor, Williams and Daweidyzk operated a business under the name of Southern Wisconsin Pharmacies. Southern Wisconsin owned an office building located at 1061 Collier Center Way, Naples, Florida 34110 (the Leased Premises). Waterford

Management, Inc. (Waterford) was one of the numerous entities owned solely by Don E. Lester (Lester).  Lester was the officer and director of nineteen family owned companies, including Waterford and the Debtor.

## EVENTS PRECEDING THE COMMENCEMENT OF THE CASE

Prior to the commencement of the Chapter 11 case of the Debtor, Southern Wisconsin acquired the Leased Premises described above.  The Leased Premises was in part occupied under a lease agreement between Waterford and the prior owners.  On May 1, 2004, Southern Wisconsin entered into an addendum with Waterford to an existing triple-net lease (Triple-Net Lease).  (Pretrial Stipulation of Undisputed Fact, paragraph 1).[1]  The Triple-Net Lease commenced on May 1, 2004 and terminated on December 31, 2005.  Lester was personally a guarantor of the Triple-Net Lease.  (Pretrial Stipulation, para. 2).  Southern Wisconsin leased units 1, 2, 3, 4, 5, 8 and 9 to Waterford.  The Triple-Net Lease contained the provision that excluded the Debtor's Personal Property that was physically located in units 1, 2, 3, 4 and 5 of the Leased Premises.  The provision explicitly stated that the Debtor's Personal Property would not be subject to a landlord's lien for rent.  (Pretrial Stipulation, para. 4).  Therefore, the Debtor's Personal Property was physically located in the Leased Premises without any formal basis for occupancy since the Debtor had no contractual

---

[1] Pretrial Stipulation of Undisputed Facts, paragraph number hereinafter will be referred to as Pretrial Stipulation., para. or paras. #.

relationship with Southern Wisconsin based on the Triple-Net Lease. Furthermore, there is nothing in the record that indicates that the Debtor occupied the Leased Premises under a sub-lease agreement with Waterford.

Waterford defaulted on its lease, and on February 16, 2005, Waterford, Lester, and Southern Wisconsin entered into a settlement agreement (Settlement) to avoid eviction as a result of the State Court action pending in the Circuit Court of the Twentieth Judicial Circuit. (Pretrial Stipulation, para. 5). Pursuant to the Settlement, Waterford and Lester agreed to pay Southern Wisconsin the sum of $131,238.18 on or before March 4, 2005. (Pretrial Stipulation, para. 6). When Lester and Waterford failed to pay the amount agreed upon, the State Court entered a final judgment and amended final judgment of eviction. (Pretrial Stipulation, paras. 7 and 8).

## EVENTS FOLLOWING THE EVICTION

On March 15, 2005, the Collier County Sheriff executed the writ of possession and evicted Waterford from the leased premises. (Pretrial Stipulation, paras. 9 and 10). All of the Personal Property of the Debtor remained on the leased premises after Waterford was evicted. (Pretrial Stipulation, para. 11). Southern Wisconsin stored the Debtor's Personal Property on the Leased Premises from March 15, 2005 until January 18, 2006.

On March 16, 2005, one day after the eviction, Southern Wisconsin served a statutory notice for abandoned personal property pursuant to Fla. Stat. Section 715.105 (2007) on Waterford. (Abandonment Notice) (Pretrial Stipulation, para. 12). The Abandonment Notice informed Waterford that the Personal Property was currently being stored in units 1 -5 of the Leased Premises at the per diem rate of $231.75. The per diem rate was calculated by multiplying 5,300 square feet used for storage at the rate of $15.00 per square foot, plus 6% sales tax, dividing the results by 365 days and multiplying that amount by the number of days the property was stored. Thus, the total amount due on the units was $71,379.00. (Affidavit of Michael Williams, Adv. Pro. Doc. No. 16, Attachment No. 1, paras. 23 and 24; Defendant's Exhibit 22).[2] It appears from the record that that the storage charges were identical to the rent Southern Wisconsin was charging Waterford under the Triple-Net Lease.

On April 4, 2005, Southern Wisconsin filed a Motion for Levy and Leave Order (Levy Motion) against Waterford in the State Court action seeking to levy on the Debtor's Personal Property which was located on the Leased Premises. On April 6, 2005, Waterford's counsel notified Southern Wisconsin that Waterford opposed the Levy Motion since the property located on the Leased Premises was the Personal Property of the Debtor. Based on the same,

---

[2] Adversary Proceeding Docket refers to adversary proceeding number 9:06-ap-00372-ALP and will hereinafter be referred to as Adv. Pro. Doc. No.

Waterford filed its opposition to Southern Wisconsin's Levy Motion (Levy Opposition). (Pretrial Stipulation, para. 14). It appears as though Southern Wisconsin overlooked the provision in the Triple-Net Lease which mentioned the fact that the ownership of the Personal Property was that of the Debtor. (Trial Transcript, page 144; lines 1 – 9).[3] Once reminded of the actual owner of the Personal Property, Southern Wisconsin served the first statutory notice pursuant to Chapter 715.106, Florida Statues (2007) on the Debtor regarding the storage of its Personal Property and the charge for storage fees. (Pretrial Stipulation, para. 18).

Southern Wisconsin scheduled the sale of the Personal Property on three separate occasions pursuant to Fla. Stat. Section 715. The first Notice of Sale of Abandoned Property noticed the sale was scheduled to be held on July 26, 2005. (Pretrial Stipulation, para. 23; Debtor's Exhibit 15). Lester, in order to avoid the sale of the Debtor's Personal Property, told Williams that he would make good on all of his promises to pay the storage costs, which is the $131,238.18 judgment, and would buy the building once he received $348 million from a bank located in the United Kingdom. Williams cancelled the sale and agreed to wait two weeks which, according to Lester, was the time needed in order to receive the monies from overseas. (TT, page 176; lines 20 -25; p 177; lines 1-4;

---

[3] Reference to Trail Transcript hereinafter will be referred to as TT, page. # ; lines #.

Pretrial Stipulation, para. 24).  In order to support his request for staying the sale, Lester paid Williams $5,000.00 and requested that the amount be applied toward the balance of the judgment entered in the Eviction Action. (TT, page 177; lines 5–11).  Two weeks came and went without any payments from Lester and, thus, Southern Wisconsin began a new statutory sale process.  (Pretrial Stipulation, para. 25)

The second attempted sale of the Debtor's Personal Property was noticed for September 13, 2005. (Pretrial Stipulation, para. 23).  Lester once again was successful in convincing Williams to cancel the second scheduled sale in exchange for an additional $5,000.00.  (TT, page 177; lines 15-22; Pretrial Stipulation, para. 26).  Lester communicated with Williams daily concerning his expectation to receive his funds from the United Kingdom.  Williams finally decided that all the promises made by Lester were lies and, instead of waiting for Lester's mystery money to arrive from the United Kingdom, on November 5, 2005, Williams published a third notice of sale of the Debtor's Personal Property to be held at a public sale on December 6, 2005 (Pretrial Stipulation, para. 27).

Prior to the scheduled sale Lester made an additional offer to Williams to pay another $5,000.00.  Williams refused to accept another payment from Lester in exchange for more time.  In order to stop the sale, Lester made good on his promise of bankruptcy and on December 5, 2005, the Debtor filed its Petition

for Relief under Chapter 11 of the Bankruptcy Code, thereby invoking the automatic stay provision of the Section 362(a) of the Bankruptcy Code.

## CONSOLIDATION OF DEBTOR'S PERSONAL PROPERTY

In late 2005, Southern Wisconsin entered into a contract to sell the Leased Premises to Nardini Properties. (TT, page 180; lines 11-13). Prior to the sale of the Leased Premises Nardini indicated that he was concerned about having five units occupied with property belonging to another party when no one occupied the actual premises. Based on the same, as a condition of the sale to Nardini, Southern Wisconsin decided to consolidate the Personal Property of the Debtor from units 1 through 5 to unit 3. Southern Wisconsin entered into a lease agreement with Nardini for the temporary storage of the Debtor's Personal Property for a monthly rental fee in the amount of $1,480.00 including sales tax or $48.79 per day. (Pretrial Stipulation, para. 30).

Two days before the final execution of the sale of the Leased Premises to Nardini Properties, Williams consolidated the Debtor's Personal Property from units 1 through 5 to unit 3. (Consolidation) (Pretrial Stipulation, para. 31). Williams retained the assistance of various individuals including, Bob West, a realtor; Pastor Schuck, a friend of Williams; and three laborers from Schuck's church to consolidate the Debtor's Personal Property to unit 3 of the Leased Premises. (TT, page 184; lines 3-10).

The Consolidation occurred without any effort being made by Southern Wisconsin and/or its agents, to secure furniture padding, boxes and wrap or any other items that could be used to protect the Debtor's Personal Property from damage. (TT, page 185; lines 11-18; TT, page 183; lines 22-25, page 284; lines 20-25, page 285; lines 1-4, and page 393; lines 20-25)  It is without dispute some of the items were stacked between 8 and 10 feet high without regard as to whether metal legs were being placed on wooden surfaces.  In sum, the Consolidation left something to be desired.  This Court notes that the record is devoid of any evidence which indicates William's malicious intent to damage the Personal Property of the Debtor and to describe it as a deliberate intentional disregard of the most elementary precautions in storing furniture would be without substance and this Court rejects the same.

### RELEASE OF DEBTOR'S PERSONAL PROPERTY

Shortly after the commencement of this Chapter 11 case, Southern Wisconsin sought relief from the automatic stay so that they would be able to sell the Debtor's Personal Property to pay for the accumulated storage services. (General Case 05-bk-29836-ALP, Docket No. 16).[4]  This Court initially denied the Motion and ordered Southern Wisconsin to release the Personal Property to the Debtor. (Gen. Case, Doc. No. 21). Thereafter, this Court reversed its

---

[4] General Case refers to General Case number 9.05-bk-26922-ALP and hereinafter will be referred to as Gen. Case. Doc. No..

decision because the Personal Property had already been released to the Debtor and granted Southern Wisconsin an equitable lien (Equitable Lien) as a replacement of the possessory lien (Possessory Lien) on the Debtor's Personal Property issued by the State Court pursuant to Chapter 715, Florida Statutes (2007). (Gen. Case, Doc. No. 21). Based on this Court's Order granting Southern Wisconsin an Equitable Lien on the Debtor's Personal Property, Southern Wisconsin filed a secured Proof of Claim (Claim) for storage cost and other charges in the amount of $64,719.43.

Upon regaining possession of the Debtor's Personal Property, Lester contacted LaDonna Haywood (Haywood), a partner at Furniture Medic, a local firm engaged in repairing damaged furniture. Haywood inspected some of the furniture for the purpose of providing an estimate for repairing the items the Debtor alleges were damaged during the Consolidation. Haywood's initial estimate was made site unseen and based on the condition of the Personal Property as described by Lester. According to the testimony as provided by the record, Furniture Medic at Lester's request filled holes in a large desk on which a computer had been mounted. Numerous other items clearly evidenced normal wear and tear.

On the Schedule of Disbursements filed with this Court, Furniture Medic was supposed to have been paid the initial sum of $10,094.12 by a check dated

March 23, 2007. (Defendant's Exhibit 28, Line 79). Furniture Medic never received the check (TT, page 352; lines 1-7) because the check was written merely to document the Debtor's alleged damage claim in this case and not to actually pay for the services rendered by Furniture Medic. (TT, page 577; lines 18-21 and TT, page 624; lines 9-11). The second check for $64,905.88 noted on the Schedule of Disbursements indicated that on April 25, 2007, a check was made payable to Furniture Medic (Defendant's Exhibit 28, line 91). No such check was issued to Furniture Medic. Lester or one of his entities did actually write one check to Furniture Medic in the amount of $10,000.00 that was deposited by Furniture Medic and dishonored by the Bank due to insufficient funds. Lester made several statements to Furniture Medic assuring Haywood that the money would be coming tomorrow from the United Kingdom. (TT, page 345; lines 9-18). Lester assured Haywood that a replacement check would be coming in November. (TT, page 348; lines 4-10; TT, page 589; lines 9-18). Lester also assured Haywood that there would be a Special Purpose account set up in the amount of $65,000.00 (TT, page 352; lines 16-25). Lester indicated that this Court had entered an order which approved the $10,094.12 payment, and the $65,000.00 Special Purpose account (TT, page 360; lines 17-21). Moreover, Lester assured Haywood that the Debtor did file an insurance claim on behalf of Furniture Medic for the amount due and owing in order to protect

12

Furniture Medic interest.  It is undisputed that Furniture Medic never received any amount of money from Lester and/or the Debtor.

Lester's tale of the mysterious $348 million that he had in the United Kingdom was not limited to telling the same to Haywood.  Lester also told the same story to Bob West, one of the realtors who inspected the premises and the Personal Property on behalf of the Debtor. (TT, page 588; lines 10-15)  Lester also told Williams that he was going to use the money coming from the United Kingdom to purchase the Leased Premises.  When Nardini Properties purchased the Leased Premises from Southern Wisconsin, Lester told Joe Nardini (Nardini) the same story, that is, he was expecting to receive money from the United Kingdom which would enable him to purchase the Leased Premises.  The evidence is crystal clear that Lester's statements with respect to the monies being held in the United Kingdom were untrue and Lester knew his statements were false concerning the money.  It is not unreasonable to infer that Lester's statements concerning the money held for him in the United Kingdom were made solely as a desperate attempt to obtain sufficient funding to purchase the Leased Premises from Southern Wisconsin.

## CONCLUSION OF LAW

Before considering the Debtor's set-off claim, it is appropriate to consider the Claim filed by Southern Wisconsin.  This Court shall briefly consider, first,

whether or not the Claim is allowable for the amount stated as filed and, second, whether or not the Claim should be allowed as a secured claim.

The allowability of claims is governed by Section 502(a) of the Bankruptcy Code, which provides as follows:

"A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects." 11 UCS § 502.

Federal Rules of Bankruptcy Procedure 3001(f) governs the evidentiary effect of filing and provides as follows:

"(f) Evidentiary Effect.  In subparagraph (f), in referring to a "proof of claim executed and filed in accordance with these rules, . . ." Federal Rules of Bankruptcy Proceeding 3001(f).

The secured claim filed by Southern Wisconsin is based on an Equitable Lien granted by this Court encumbering the Debtor's Personal Property.  At no time did the Debtor between March 15, 2005 and December 5, 2005, make any attempt to remove its Personal Property from the Leased Premises.  This Court is convinced and satisfied that the Debtor and Lester merely stalled for additional time hoping to receive the much-needed funds allegedly being transferred from the United Kingdom.

An equitable lien is a right granted by a court of equity, arising by reason of the conduct of the parties affected, that would entitle one party as a matter of equity to proceed against certain property. *Della Ratta v. Della Ratta*, 927 So. 2d 1055 (Fla. Dist. Ct. App. 4th Dist. 2006); *Epstein v. Epstein*, 915 So. 2d 1272 (Fla. Dist. Ct. App. 4th Dist. 2005). An equitable lien may be declared by a court of equity out of general consideration of right and justice as applied to the relations of the parties and the circumstances of their dealings. *Della Ratta v. Della Ratta*, 927 So. 2d 1055 (Fla. Dist. Ct. App. 4th Dist. 2006).

Under Florida law, an equitable lien may be imposed on one of two bases: (1) a written contract that indicates an intention to charge a particular property with a debt or obligation; or (2) a declaration by a court out of general consideration of a right or justice, as applied to the particular circumstances of the case. *In re Laing*, 329 B.R. 761 (Bankr. M.D. Fla. 2005); *In re Dorado Marine, Inc.*, 321 B.R. 581 (Bankr. M.D. Fla. 2005). The imposition of an equitable lien is based on the premise that one should not be unjustly enriched. *In re Laing*, 329 B.R. 761 (Bankr. M.D. Fla. 2005). Courts should take into consideration the relationships of the parties in determining whether an equitable lien is necessary. *In re Dorado Marine, Inc.*, 321 B.R. 581 (Bankr. M.D. Fla. 2005). An equitable lien is a remedial tool that is used to prevent an inequity of one party against another and that may be used as means of enforcing, against a

piece of property, a party's obligation that has resulted in benefit to that property. *In re Crum*, 294 B.R. 402 (Bankr. S.D. Fla. 2004), subsequently aff'd, 2005 WL 2456223 (S.D. Fla. 2005), judgment aff'd in part, rev'd in part on different grounds, 454 F.3d 1292 (11th Cir. 2006).

Based on the foregoing, this Court is satisfied that the Equitable Lien granted by the Court in replacement of the Possessory Lien held by Southern Wisconsin on the Debtor's Personal Property was proper, final, and no longer appealable. Thus, the Equitable Lien represents the law of this case.

This leaves for this Court's consideration the determination of the extent of the Equitable Lien and the amount of the claim asserted by Southern Wisconsin.

The amount of the Claim filed by Southern Wisconsin was never challenged by the Debtor. In the absence of the evidence to the contrary as to the value of the Debtor's Personal Property which is the subject of the Equitable Lien on the date of the commencement of the case, the Claim shall be allowed in the amount as filed. Therefore, this Court is satisfied that the Claim filed by Southern Wisconsin shall be allowed in the amount of $64,719.43.

The next issue presented to this Court is whether the Claim filed by Southern Wisconsin should be allowed as a secured claim. In light of the fact that the Debtor did not seek a bifurcation of the Claim pursuant to Section 506

16

of the Bankruptcy Code, coupled with fact that the record is devoid of any persuasive evidence as to the value of the Debtor's Personal Property which is the subject of the controversy between the parties, the Claim as filed shall be allowed as a secured claim.

In sum, the Claim of Southern Wisconsin shall be allowed in the amount of $64,719.43 as a secured claim unless the Debtor prevails on its set-off claim, which will either eliminate the Claim in its entirety or possibly exceed the amount of Southern Wisconsin's Claim in which case the Debtor would be entitled to a money judgment in excess of the Southern Wisconsin's Claim.

In its Complaint, the Debtor seeks a set-off as an affirmative relief. It cannot be gainsaid that the burden to prevail on this claim is on the party who is asserting the affirmative defense.

The primary thrust of the Debtor's attack on the claim for storage filled by Southern Wisconsin is based on the proposition that the Debtor had no agreement with Southern Wisconsin and, therefore, Southern Wisconsin has no basis to claim any storage fees due from the Debtor.

Whether or not the Debtor had any agreement with Southern Wisconsin is irrelevant simply because the Claim of Southern Wisconsin is not based on a contractual agreement. As noted above, the Claim as filed is based on the enforcement of the Equitable Lien granted to it by this Court as a replacement of

the Possessory Lien it had when this Court ordered the Personal Property to be returned to the Debtor.

Accordingly, Southern Wisconsin's Claim shall be allowed unless the Court finds:

1.      that the amount charged to the Debtor for storage fees is unreasonable;

2.      that the claim of loss of the Personal Property was due to negligence and willful disregard by the conduct required from one under Chapter 715.107, Florida Statues;

3.      if the claim of set-off/recoupment asserted by the Debtor is found to be valid and justified which would eliminate the Claim or would be in excess of the Claim of Southern Wisconsin, then this would entitle the Debtor to obtain a money judgment against Southern Wisconsin for the assessed amount;

4.      that the Claim is subject to equitable adjustment based on Southern Wisconsin's intentional violation of the automatic stay including actual and punitive damages pursuant to Section 361(k)(1) of the Bankruptcy Code.

Based on the foregoing the Debtor seeks relief in Count I for an order sustaining the Debtor's Objection to Southern Wisconsin's Claim, to disallow the same with prejudice and for this Court to find that Southern Wisconsin has no meritorious claim against the Debtor.

To determine the extent and validity of a claim of set-off requires a detailed discussion of this record and it is not readily determinable without considering in detail the evidence submitted in support of and in opposition to the claim.

First, the Debtor contends, and there is evidence in the record, that Southern Wisconsin did not secure the Leased Premises after the eviction and failed to change the locks on one or more of the units with the knowledge that access to any one of units 1, 2, 3, 4 and 5 provided ready accesses to all those units. (TT, page 46; lines 24-25; TT, page 47, lines 9-20; TT, page 127; lines 1-4). The claim that Southern Wisconsin handed out keys to various individuals without accountability or supervision of access is grossly exaggerated and not supported by the record.

The record is clear that Southern Wisconsin kept the Leased Premises under lock and key at all times. Southern Wisconsin only provided keys to agents who unlocked the space in very limited circumstances. Williams provided a key to Robert West, the real estate broker who listed the building for sale. (TT, page 273; lines 8 – 10). Williams also provided a key to Pastor Roy Shuck, a close personal friend of Williams. (TT, page 129; lines 17 – 23). Following the consolidation of the Leased Premises, Williams turned the keys to

the Leased Premises over to an agent of Nardini Properties, LLC, the new owner

of the building. (TT, page 193; lines 11 – 13).

The fact that Southern Wisconsin gave access to Nardini, the current

owner of the Leased Premises, was justified and there is nothing in this record to

indicate that Nardini's access to the Leased Premises resulted in any damage

and/or loss of the Debtor's Personal Property. It is without dispute that Southern

Wisconsin did not maintain electricity in the units (TT, page 41, lines 9-19; TT,

page 173; lines 1-3). During the limited time that unit 3 had electricity during

the relevant period, Southern Wisconsin directed the realtor to maintain the

unit's temperature at 80 degrees Fahrenheit. While it is true that unit 3 of the

Leased Premises was not climate controlled, there is no quantifiable evidence

which would justify the findings that Southern Wisconsin's alleged failure to

maintain the premises as climate controlled caused a specific loss to any of the

Debtor's Personal Property. Furthermore, the evidence provided to this Court

does not support the Debtor's contentions that based on Southern Wisconsin's

alleged failure to safeguard the premises and permit access to same to various

individuals, including Nardini, caused damage to the Debtor's Personal

Property.

In this connection, it should be noted at the outset that, contrary to the

Lester's contentions, this Court finds that various items of the Debtor's Personal

Property were not new and were not constructed of 100% wood. As a matter of fact, this Court notes the majority of the Debtor's Personal Property was constructed of medium density fiberboard (MDF), with a veneer finish. Furthermore, the evidence as presented to the Court shows that some, if not all of the items the Debtor claims were damaged during the Consolidation, had actually been moved several times prior to being housed in the Leased Premises.

The record is clear that the Debtor's Personal Property prior to being moved to the Leased Premises was located in the Bank of America building, and prior to being in the Bank of America building the Personal Property was located at the SunTrust building. This Court is satisfied that since the furniture had been moved so many times prior to being placed in the Leased Premises, it is not unlikely that some of the damage claimed by the Debtor was due to previous moves of the Personal Property. However, some of the items were damaged during the move and this Court will only consider the damages to the Debtor's Personal Property during the Consolidation.

In order to establish the amount of the Debtor's claimed losses due to the Consolidation, the Debtor's primary witness James E. Moon (Moon) testified that his opinion, as provided by his report, is based on documents that were provided to Moon by Lester, which included the Schedule of Disbursements. Lester admitted that the documents were full of errors but he did not inform

Moon of such discrepancies. The Schedule of Disbursements was replete with errors and listed a substantial amount of disbursements which were never actually made. It is true that in addition to Moon's opinion based on the documents provided by Lester, Moon also made some independent investigation, such as, contacting local furniture stores for pricing on some of the replacement furniture. Lester assumes in his assertions that the Debtor's furniture was high end, (TT, page 473; line 7) solid wood, (TT, page 480; lines 21-24) and that the Debtor's Personal Property was brand new. This Court is satisfied that Lester's assumptions are not supported by the record and the documents provided to Moon by Lester with respect to the Debtor's Personal Property were tainted and, based on the same, Lester's assumptions are rejected.

As noted earlier in the discussion of the testimony of Haywood, none of the furniture as presented to Haywood was high-end (TT, page 338; lines 7-11) nor made of solid wood (TT, page 368, lines 4-8).

Moon when viewing the photographs provided at the trial of the Debtor's Personal Property admitted that the pieces shown in the picture were either veneer or MDF with veneer and, therefore, not constructed of solid wood. (TT, page 481; lines 9-25; TT, page 482; lines 1-15). The Debtor's own Depreciation Expense Report (Defendant's Exhibit 25) indicated that most of the furniture

was purchased in 1988 (TT, page 491; lines 8-15) and, based on the same, the furniture was definitely not brand new.

Moon, relying on the estimate he saw from Furniture Medic and reviewing Haywood's trial testimony, estimated the cost to repair the furniture which had been damaged during the Consolidation. (TT, page 443; lines 22-25 and page 444; lines 1-5). However, during Haywood's testimony at the trial, Haywood indicated that she could not provide an estimate for repairing the damage caused from moving and storing the furniture. (TT. page 368, lines 12-23). Haywood testified that if she were to repair any type of damage that could have possibly happened during the Consolidation the cost would be considerably less than $10,094.12 (TT. page 368; lines 19-23). Nonetheless, Moon guesstimated the damage to the Debtor's Personal Property to be approximately $217,216.00. (TT. page 449, lines 22-25). This Court considers this amount to be highly speculative because it is based on unwarranted assumption of facts, none of which have been established to be a valid basis of loss. Therefore, it is the conclusion of this Court that the amount for damages due to the Consolidation is $10,094.12 and, therefore, the Debtor is entitled to a set-off in the amount of the same.

The Debtor also claims that it suffered a loss due to stolen or lost assets. This Court carefully considered this claim and is satisfied that this record is

devoid of any credible evidence to sustain the claim as asserted for these items. Accordingly, this Court is satisfied that the Debtor's claim for the lost and/or stolen items will not be considered part of the allowable claim for set-off.

However, taking into consideration the testimony in support of the lost and/or stolen items, the Debtor failed to present any creditable evidence to support its claim other than the self serving statements of Lester and his wife without any documentation of the alleged claims made for these items.

A separate final judgment shall be entered in accordance with the foregoing.

DONE at Tampa, Florida, on ___ December 21, 2007 _____.

ALEXANDER L. PASKAY
United States Bankruptcy Judge